**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
_____

**NANODETEX CORPORATION,**

    Plaintiff,

v.                                                                                                                                   Civ. No. 05-1041 BB/LAM

**SANDIA CORPORATION, DEFIANT**
**TECHNOLOGIES, RONALD MANGINELL,**
**DOUG ADKINS, and PATRICK LEWIS,**

    Defendants;

**SANDIA CORPORATION,**

    Defendant-Counterclaimant,

v.

**NANODETEX CORPORATION, ALAN P.**
**SYLWESTER, and ANGELO L. SALAMONE,**

    Counterdefendants;

**DEFIANT TECHNOLOGIES,**

    Defendant-Counterclaimant,

v.

**NANODETEX CORPORATION, ALAN P.**
**SYLWESTER, and ANGELO L. SALAMONE,**

    Counterdefendants.

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court for consideration of a motion for partial summary judgment (Doc. 187) filed by the Individual Defendants. The motion addresses Counts VII, X, and XI of Plaintiff's amended complaint, which were the only counts brought against the Individual

Defendants. Having reviewed the submissions of the parties and the applicable law, the Court finds the motion should be granted in part and denied in part.

The Individual Defendants are current or former employees of Defendant Sandia Corporation, and two of the Individual Defendants (Manginell and Lewis) were formerly affiliated with Plaintiff. After Manginell and Lewis ended their involvement with Plaintiff, Plaintiff entered into a business agreement with Sandia, the exact terms of which are in dispute. After Sandia notified Plaintiff of alleged breaches of the agreement, Plaintiff filed this lawsuit against Sandia and named the Individual Defendants as parties in the Amended Complaint. Count VII of the amended complaint alleges a common-law claim of fraud civil conspiracy; Count X alleges another common-law claim, for tortious interference with a contract; and Count XI alleges a common-law claim of conversion. The Individual Defendants have moved for partial summary judgment on all three claims.

**Standard of Review:** Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Medina v. Income Support Div.*, 413 F.3d 1131, 1133 (10th Cir. 2005) (quoting Fed. R. Civ. P. 56(c)). In response, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith*, 475 U.S. 574, 587-88 (1986). To avoid summary judgment, the nonmoving party may not rest upon the mere allegations in the pleadings but must show, at minimum, an inference of the existence of each essential element of the case. *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1016-17 (10th Cir. 2001) (citing *Hulsey v. K-Mart, Inc.*, 43 F.3d 555, 557 (10th Cir. 1994)). When viewing the evidence, the Court must draw reasonable inferences in favor of the non-moving party. *Matsushita*, 475 U.S. at 587.

**COUNT XI – CONVERSION:** Plaintiff's conversion claim is based on two contentions: first, that the Individual Defendants converted tangible property belonging to Plaintiff, in the form of certain schematics; and second, that the Individual Defendants converted intangible property belonging to Plaintiff, in the form of intellectual property. As discussed below, neither contention has merit.

**Schematics:** Plaintiff points to the fact that the Individual Defendants created a web-site for their corporation, Defendant Defiant Technologies. On that web-site, www.defiant-tech.com, the Individual Defendants included a link entitled "Sandia's Mico-Chemical (sic) Analysis Systems." By following this link, a user is able to access a number of pages depicting various systems developed by Sandia National Laboratories for microchemical detection, including a current mature system, next-generation systems, and future systems. Some of these depictions include Sandia innovations, such as a preconcentrator, which according to Plaintiff fall within their exclusive license agreement. Plaintiff thus reasons that, by referencing this Sandia technology on their web-site, and indicating on that web-site that Defiant uses the Sandia technology in its own systems, the Individual Defendants have converted to their own use schematics belonging to Plaintiff.

There are a number of problems with Plaintiff's argument. First, Plaintiff's exclusive license agreement by its terms applies only to specified exclusive fields of use. Other fields of use, most notably uses by or for United States governmental entities, are not covered by the license agreement. [Exh. 1 to Doc. 196, Lic. Agmt., par. 12] Plaintiff has pointed to nothing on the Defiant web-site indicating Defiant or the Individual Defendants are using or plan to use the Sandia preconcentrator, or other Sandia technology included in the license agreement, to infringe on Plaintiff's exclusive fields of use. Absent such an indication, Plaintiff's argument that the Individual Defendants have converted something belonging to Plaintiff has no merit, because the Individual Defendants' actions do not infringe on any property right possessed by Plaintiff. *See Security Pacific Financial Services v. Signfilled Corp.,* 956 P.2d 837, 842 (N.M.App. 1998) ("Conversion is the unlawful

3

exercise of dominion and control over property belonging to another in defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful detention after demand has been made.").

In this regard, it is also important to point out that the schematics referenced on the Defiant web-site belong to Sandia National Laboratories and are clearly marked as such. There is no evidence in the record that Plaintiff created these schematics or has any property right in the schematics themselves. Plaintiff's argument, therefore, is that Individual Defendants, by including a link to schematics owned by Sandia on their web-site, have converted tangible property interests belonging to Plaintiff, simply because the schematics include Sandia technology that is included in Plaintiff's exclusive license agreement. This cannot be true; if the Individual Defendants have infringed on anyone's rights to the schematics by asserting some type of ownership right to schematics, it is the rights of Sandia National Laboratories, the identified owners of the schematics.[1] For this reason, the case relied on by Plaintiff in its brief is inapposite. *Northcraft v. Michener Assocs., Inc.*, 466 A.2d 620, 628 (Pa. Super. Ct. 1983). In that case the plaintiff's claim was that the defendant had retained control over actual documents containing design sketches allegedly belonging to the plaintiff, whereas in this case no actual documents have been appropriated and the documents referenced do not even belong to Plaintiff.

The final reason Plaintiff's conversion action cannot be based on the web-site's link to Sandia's schematics is that on the web-site the Individual Defendants have done no more than say

---

[1] The result might be different if Plaintiff had created the schematics and the Individual Defendants were using the schematics on their web-site to try to attract customers. In the instant situation, however, the Individual Defendants have merely referred web-site visitors to schematics belonging to Sandia, and those schematics depict technology to which Plaintiff does not even have an exclusive license (due to the government-use exception and the other exceptions in the license agreement). That is simply not enough to say that the Individual Defendants have used Plaintiff's property to such an extent that the use rises to the level of conversion. *See, e.g.,* Restatement (Second) Torts, § 227 (conversion occurs if one uses a chattel in a manner which is a serious violation of another person's right to control such use).

they will be using Sandia's technology, or improvements thereon, in Defiant's sensors. This assertion of the right to use the technology (if indeed the web-site rises to that level) is insufficient to support a conversion claim. "The mere assertion of ownership of the chattel, or of some proprietary right in it, is not enough to constitute conversion in the absence of some other act which is an exercise of dominion or control." Restatement (Second) Torts § 224, cmt. d (1965). Unless and until the Individual Defendants or Defiant actually use the technology belonging to Plaintiff, in conflict with Plaintiff's legal rights to that technology, no conversion has occurred. *Cf. In re Crown-Simplimatic Inc.*, 299 B.R. 319, 326 (Bkrtcy.D.Del. 2003) (taking or recording of a security interest in property is not equivalent to converting the property).

**Intellectual Property:** Plaintiff claims the Individual Defendants have converted intellectual property [2] because they have "improperly supplanted Nanodetex as Sandia's exclusive licensee." [Pltf. Resp. Brief p. 51] As the Court has already discussed with respect to Defiant's motion for summary judgment, this claim is at best premature. Neither Defiant nor the Individual Defendants have obtained a license to any Sandia technology at all, let alone Sandia technology licensed exclusively to Plaintiff. Therefore, the Individual Defendants have not obtained any legal rights to use technology "belonging" to Plaintiff, and there is no evidence they have used such technology in any field of use exclusively licensed to Plaintiff.[3] The conversion claim based on Defiant's negotiations with Sandia is akin to a claim for attempted conversion rather than actual

---

[2] While there are serious legal issues as to whether conversion theory applies to intellectual property, and how copyright or patent preemption doctrine might apply to situations such as this one, the Court need not resolve these difficult issues here. *See generally United States ex rel. Berge v. Bd. of Trustees of Univ. of Alabama*, 104 F.3d 1453, 1463 (4th Cir. 1997).

[3] The Court notes there is evidence in the record that Defendant Adkins has manufactured and sold a number of sensors using preconcentrator technology that is apparently part of the license agreement between Plaintiff and Sandia, although it appears he may have done so on behalf of Sandia at the time. [Doc. 248, Exh. 47] However, even if he was acting as an individual, Adkins sold these sensors to an air force base and to another government laboratory. [*Id.*] Plaintiff has not argued that these sales conflicted with any exclusive field of use belonging to Plaintiff, and the government-use exception would seem to be clearly applicable to the sales.

conversion. As the Court discussed in its previous opinion, a claim for attempted conversion is not viable. For the above reasons, summary judgment will be granted on the conversion claim brought against the Individual Defendants.

**TORTIOUS INTERFERENCE WITH CONTRACT:** Plaintiff maintains the Individual Defendants have impermissibly interfered with the existing contract (the license agreement) between Plaintiff and Sandia in a number of ways. In New Mexico, although it is somewhat easier to establish the tort of interference with an existing contract than to prove interference with a prospective contract, "[e]stablishing tortious interference with contract is not easy." *Ettenson v. Burke*, 17 P.3d 440, 446 (N.M. App. 2000). The elements of this claim include knowledge of the contract on the defendant's part; a refusal to perform the contract by the third party; causation of that refusal by the defendant, who must have played an active and substantial part in such refusal; damages flowing from the breached contract; and the absence of a privilege or justification for the defendant's actions. *Id*. The Individual Defendants' motion addresses only the causation prong of the tort, and therefore that is the only prong the Court need discuss, although Plaintiff's brief analyzes the other prongs as well.

Plaintiff maintains the Individual Defendants interfered with Sandia's contractual obligations under the license agreement in three specific ways.[4] To properly address this cause of

---

[4] In the "facts" section of Plaintiff's response brief, Plaintiff discussed other allegedly wrongful actions by various Individual Defendants, such as the fact that in February 2002 Manginell wrote an e-mail message advising Sandia not to enter into a CRADA (cooperative research and development agreement) with Plaintiff. [Doc. 248, pp. 12-13] Plaintiff has not explained how this e-mail might have caused Sandia to commit a breach of contract, and the Court has therefore not attempted to determine whether this action by Manginell might be considered a tortious act. It is not the Court's responsibility to make arguments on behalf of a party, and the Court's discussion of the tortious-interference-with-contract claim is therefore limited to the three specific alleged breaches of contract discussed in the argument section of Plaintiff's brief. Any references in the facts section to other alleged wrong-doing by Individual Defendants are assumed to be relevant only to show the Individual Defendants bore ill-will toward Plaintiff, which is undisputed at least as to Manginell and Lewis, or to show they had competitive reasons for wanting Plaintiff to fail.

action, it is necessary to identify the precise acts of each Individual Defendant that are at issue, since Plaintiff has accused each Individual Defendant of committing different tortious acts.  As a means of organizing the discussion, the Court will address Plaintiff's assertions in roughly chronological order.

**Gold Brick Letter Obligations:**  Plaintiff first contends that all three Individual Defendants hindered Sandia's performance of its obligations under the gold brick letter.  Due to the Individual Defendants' allegedly "uncooperative" and "begrudging" participation in the technology transfer, Plaintiff contends they caused, at least in part, Sandia's failure to transfer all of the required information in a timely manner.  Of course, Plaintiff's claim cannot rest on the fact that the Individual Defendants may not have been happy about what, if anything, they were required to do to facilitate the technology transfer contemplated in the gold brick letter.  Instead, the Court must determine what evidence there is in the record concerning each Individual Defendants' responsibilities to cooperate in the technology transfer, and how each Individual Defendant might have failed to carry out those responsibilities.

As to both Manginell and Lewis, Plaintiff has failed to provide any evidence that either Defendant had a duty to produce any specific information but refused to do so, or delayed in cooperating.  Instead, the evidence Plaintiff has referred to indicates that Plaintiff's representative, Greg Frye-Mason, specifically avoided involving Manginell and Lewis in the technology transfer by naming other Sandia employees as contact persons through whom the requests for information, and responses thereto, would flow.  [Doc. 248, Exh. 2, Frye-Mason depo. pp. 179, 181-182, 255]  He did so because he thought Manginell and Lewis would not be as cooperative.  [*Id.*]  Frye-Mason did obtain some gold brick information from Manginell, and testified he had no direct indication that Manginell withheld any transfer of information to Plaintiff.  [*Id.* p. 181]  For his part, Manginell testified at his deposition that he provided three pieces of information, and received no other requests for information concerning the gold brick letter.  [Doc. 188, Exh. 8, p. 94]  Lewis testified that he

7

did not provide any information to Plaintiff and was never asked to do so by anyone, and Plaintiff has submitted no evidence that would contradict those statements. [*Id.*, Exh. 9, p. 92]

Plaintiff is left with arguing that Lewis and Manginell were hostile toward Plaintiff, and unwilling to provide information voluntarily. Such unwillingness, however, does not rise to the level of causing a breach of contract, in the absence of evidence indicating Manginell and/or Lewis had a duty to volunteer the information. As the Court has discussed in the opinion addressing the breach-of-contract claim, there is an issue of fact as to whether Sandia had a duty to volunteer the information contemplated by the gold brick letter. However, neither Manginell nor Lewis was a party to the contract between Plaintiff and Sandia, and the contract therefore imposed no duties on them. If Plaintiff had uncovered evidence that Lewis or Manginell somehow sabotaged the transfer of information to Plaintiff, or provided false information, or had any role in Sandia's delay in providing the information needed by Plaintiff, the result would be different. In the record at this point, however, there is only suspicion and supposition that because Manginell and Lewis were hostile toward Plaintiff, and because they were knowledgeable about aspects of the gold brick technology, they must have acted to cause Sandia to delay the transfer of information. Such supposition is not enough to establish an issue of fact warranting denial of summary judgment. *See, e.g., Lindsey v. Storey*, 936 F.2d 554, 563 (11th Cir. 1991) (plaintiff's supposition that deputy was the individual responsible for plaintiff's detention was not sufficient to avoid summary judgment).

As to Defendant Adkins, the situation is different because Plaintiff has identified three particular pieces of information or technology that Adkins was asked to provide to Plaintiff; one was never provided and there is evidence the other two were defective. The information that was not provided consisted of "instructions on fluidic assembly;" Frye-Mason requested these instructions and directed his request to Adkins in the summer of 2002. [Doc. 248, Exh. 31] However, Frye-Mason testified at his deposition that he did not see such written instructions while he worked at Sandia, and Adkins testified there were no documents at Sandia that would fit that description.

[Indiv. Def. MSJ, Exh. 3, p. 219; Exh. 5, pp. 256-57] In the absence of evidence indicating the requested document or documents actually existed, Adkins cannot be held responsible for failing to provide the requested information.

The two types of technology that may have been defective (there is conflicting evidence on this point) were a SAW and several ASICs.[5] In the summer of 2004 Adkins and Richard Cernosek, who at that time was the "technical point of contact" between Sandia and Plaintiff, decided to provide these items to Plaintiff. [*Id*. Exh. 7, p. 215-16] Plaintiff had not requested these items, but was "alluding to difficulties" in making Sandia's SAW/ASICs system work. [*Id*.] Adkins, Cernosek, and another Sandia employee made a "committee decision" to give a working SAW/ASICs assembly to Plaintiff to show that those assemblies would work, although there is also evidence that Cernosek asked Adkins to give the items to Plaintiff. [*Id*.] However, there is evidence that the assembly Adkins gave to Plaintiff did not work as it was supposed to, and in fact an employee of Plaintiff characterized as "malpractice" Sandia's statement that the assembly functioned as a "SAW detector." [Doc. 248, Exh. 35] In addition, the evidence at this point is conflicting as to whether providing a working SAW/ASICS assembly was part of Sandia's obligations under the gold brick letter, since Frye-Mason specifically requested information on SAWs and ASICs, on a priority basis, in June of 2002. [*Id*., Exh. 31] By providing a defective assembly to Plaintiff, therefore, Adkins arguably caused Sandia to violate the requirements of the gold brick letter. Since that is the only prong of the tortious-interference claim addressed in the motion for summary judgment, that motion must be denied.[6]

---

[5]It is not necessary for purposes of this opinion to explain the acronyms or the technology.

[6]At trial Plaintiff will, of course, have to present evidence meeting all of the elements of the tortious-interference claim with respect to the gold brick letter in order to have that claim submitted to the jury.

**Breach of Agreement to License**:  Plaintiff next argues that Defendant Lewis caused a breach of Sandia's obligations under the Agreement to License document executed at the same time as the license agreement and the gold brick letter.  The agreement to license covered technology other than that included in the exclusive-license provisions of the license agreement.  [Doc. 164, Exh. 1, following License Agreement]  Under the agreement to license, Plaintiff would receive an exclusive license to specified technology listed in the agreement, but only under certain conditions: first, the Department of Energy ("DOE") would have to waive title to such invention; and second, Sandia would have to file a patent application for the invention.  [*Id.*]  Sandia was given complete discretion to decide not to seek a waiver of title from the DOE, or to file a patent application.  [*Id.*]  If Sandia decided not to do so, Sandia agreed not to oppose any effort by Plaintiff to obtain a waiver of title to the invention directly from the DOE.  [*Id.*]

One of the inventions listed in the agreement to license was the "[u]se of heated chamber for pumping and for pressure generation for very small GC systems" and the inventors of this process were listed as Defendant Lewis and Greg Frye-Mason.  In February 2002, Frye-Mason indicated he was having trouble getting Lewis to sign a disclosure form that was apparently necessary to the patenting process.  [Doc. 248, Exh. 22]  At their depositions, Frye-Mason and Lewis both explained that they had a dispute over which one of them actually invented the process, and was therefore entitled to be listed as the inventor.  [Indiv. Def. Reply, Exh. B, p. 109; Exh. C, p. 23]  Plaintiff maintains that, by interfering with the patenting process, Lewis caused Sandia to breach its obligations under the agreement to license.

There are at least two problems with Plaintiff's argument.  First, and perhaps most significantly, there is no evidence in the record indicating that any breach of the agreement to license actually occurred.  The only information in the record is that Frye-Mason was having trouble getting Lewis to cooperate with the patenting process.  There is no evidence indicating whether a patent was ever applied for despite Lewis' actions or why it did not issue; *e.g.*, whether the effort was

10

abandoned due to his alleged intransigence, or whether Plaintiff decided not to pursue the matter. Absent evidence of a breach of the agreement to license, Lewis cannot be said to have tortiously interfered with that agreement.

A second difficulty with Plaintiff's position is the fact that the agreement to license, by its terms, gives Sandia complete discretion to apply for a waiver of title from DOE and file a patent application, or to refrain from doing so. Where such complete discretion is afforded a party to a contract, that party's failure to act cannot be considered a breach of the terms of the contract. *See, e.g.,* Restatement [Second] of Contracts § 2, comment e (1979) (where one party's duties only arise if a specific event comes to pass, those duties are enforceable promises only if the specified event actually occurs); *America's Favorite Chicken Co. v. Cajun Enter., Inc.*, 130 F.3d 180, 181-2 (5th Cir.1997) (affirming dismissal of breach of contract claim where franchise agreement vested complete discretion in franchisor to provide assistance in operations). Assuming Lewis caused Sandia not to apply for a D.O.E. waiver or a patent for the heated-chamber-pump process, Sandia's failure to do so cannot be considered a breach of the agreement to license because it was within Sandia's discretion to decide not to pursue such action. Again, absent a breach of the agreement to license, Lewis did not tortiously interfere with that contract.

**Breach of License Agreement:** Plaintiff's final argument is that the Individual Defendants "were intimately involved in Sandia's decision to threaten Nanodetex with the suspension of its license in the spring and summer of 2005..." [Pltf. Resp. p. 44] Plaintiff's version of events, as set out in the brief, is as follows: (1) Sandia upper-management was aware that the Individual Defendants were planning to form a company to compete with Plaintiff in Plaintiff's exclusive fields of use, using technology licensed exclusively to Plaintiff; (2) Sandia decided it would rather work with Individual Defendants and their company, Defiant, than with Plaintiff; (3) Sandia therefore threatened to revoke Plaintiff's exclusive-license rights and declared Plaintiff in breach of the license agreement; and (4) Sandia simultaneously involved itself in negotiations with the Individual

11

Defendants and Defiant, with the goal of supplanting Plaintiff as the exclusive licensee of Sandia's microchemlab technology.

In support of this theory, Plaintiff points to evidence that mainly shows the suspicious timing between the Individual Defendants' decision to form a private company and Sandia's decision to initiate the process ultimately resulting in Sandia's declaration that Plaintiff was in breach of the license agreement. There is evidence that Sandia management personnel knew, at least as early as 2003, that at least some of the Individual Defendants were interested in spinning off a private company that could utilize Sandia's microchemlab technology. [Doc. 248, Exh. 27] In the fall of 2004, Defendant Adkins developed a "drop-in die manifold" that in his view greatly enhanced the commercial possibilities of Sandia's sensor. [*Id.*, Exh. 38] In late 2004 or early 2005, Sandia management began discussing the possibility of terminating Plaintiff's exclusive license rights and making them non-exclusive. [Doc. 275, Exh. 5, p. 68] Apparently as a result of these discussions, Kevin Murphy began an e-mail exchange with Counterdefendant Angelo Salamone, asking whether Plaintiff had met the September 2004 working-prototype deadline established by the license agreement. [Doc. 302, Exh. 17, Exh. A] This exchange continued into March 2005. [*Id.*, Exhs. B-E] Also in March 2005, the Individual Defendants began discussing the formation of a private company to build and sell sensors using Sandia technology. [Doc. 248, Exh. 5, Adkins depo, page # illegible] In April 2005, Sandia's attorney sent a letter to Plaintiff threatening to terminate the license agreement unless Plaintiff demonstrated a working prototype within thirty days of the date of the letter. [Doc. 248, Exh. 39] Approximately a month later, Sandia management was informed of the Individual Defendants' intention to spin off a private company. [*Id.*, Exh. 5, illegible page #] In early June, Defendant Adkins formally requested an entrepreneurial separation from Sandia and notified Sandia the new company would seek intellectual property from Sandia in the area of chemical detection, pointing out that others had licensed technology in the same area but had not been able to develop a commercial product. [*Id.*, Exh. 45] Less than two weeks later, Sandia's

attorney sent another letter to Plaintiff indicating Sandia would not extend the prototype deadline. [*Id.*, Exh. 44]  The Individual Defendants incorporated Defiant Technologies later that same month, and began negotiating with Sandia to obtain licenses to certain forms of intellectual property.

Plaintiff argues in essence that it cannot be a coincidence that Sandia began its formal attempts to terminate the license agreement at the very time the Individual Defendants were creating new technology that could make a commercial product more feasible and then were beginning their efforts to spin off a private company that would compete with Plaintiff in building sensors using microchemlab technology.  Instead, Plaintiff contends, Sandia must have decided to eliminate Plaintiff's exclusive license rights in order to grant those same rights to its now-favored spinoff, Defiant Technologies.  Of course, it is not enough to merely show that Sandia preferred Defiant over Plaintiff as an entity to develop the sensor technology for a commercial market.  Instead, there must be evidence that the Individual Defendants affirmatively encouraged, urged, or persuaded Sandia to try to eliminate Plaintiff's exclusive rights so that Defiant could acquire those rights.  *See, e.g.,* Restatement (Second) Torts § 766, cmts. m and n, p. 14 (1977) (even if A knows of B's contract with C, A can solicit business from B as long as he does not urge B to break the contract with C; similarly, merely knowing that B has a contract with C does not prevent A from entering into a contract with B, even if that contract will prevent B from performing the contract with C); *McLinden v. Coco*, 765 N.E.2d 606, 617 (Ind. App. 2002) (where defendant did not approach third party to propose contract, defendant did not induce third party to break its contract with plaintiff). In other words, simply providing an alternative customer or partner to Plaintiff is not sufficient inducement to allow the imposition of tort liability on the Individual Defendants; instead, they must have done something to persuade Sandia to breach the license agreement.

Although the evidence is extremely thin on this point, the Court finds it is sufficient to allow this claim to proceed at the summary-judgment stage.  There is no direct evidence that any Individual Defendant had a conversation with any Sandia decision-maker concerning their spinoff

plans until early May of 2005.  However, there is evidence that the Individual Defendants, through Adkins, at that time notified Sandia that Defiant planned to try to obtain permission to use at least some technology that was part of Plaintiff's exclusive rights under the license agreement -- specifically, the planar preconcentrator.  [Doc. 248, Exh. 45, Table 2][7]  At that time also, Adkins pointed out that "Others have licensed chemical detection technologies from Sandia and had major difficulties in making a product from the technologies."  [Doc. 248, Exh. 45]  This is an obvious reference to Plaintiff, and one possible interpretation of that statement as well as the rest of Adkins' memorandum is that Defiant would do a better job of commercializing the chemical-detection technology than Plaintiff had been able to do.  Drawing all inferences in favor of Plaintiff, Adkins' memorandum and the reference to Plaintiff's exclusive technology might cross the line from simply soliciting business to subtly encouraging Sandia to terminate Plaintiff's exclusive license rights to allow the Individual Defendants to utilize them.  *See, e.g., In re Estate of Albergo*, 656 N.E.2d 97, 103 (Ill. App. 1995) (claim for tortious interference with contract requires some active persuasion, encouragement, or inciting that goes beyond merely providing information in a passive way).  When combined with the timing of the creation of Defiant, the initiation of negotiations, and Sandia's official refusal to extend the time allowed Plaintiff to produce a working prototype, there is a fact issue as to the interrelationship between the Individual Defendants' actions and Sandia's alleged breach of the license agreement.[8]  Again, since causation is the only issue addressed in the motion

---

[7]This table lists "Planar pc" as technology already covered by exclusive licenses, but states that Defiant will seek rights where they can be acquired.  The patent number given for the planar pc is the same as the patent number for the planar preconcentrator that was part of the technology included in the license agreement.  [Doc. 164, Exh. 1, License Agmt., p.18]

[8]Although Defendant Adkins was the person who notified Sandia of the desire to use some technology licensed exclusively to Plaintiff, as well as the one who implied Defiant could be a better commercialization partner than Plaintiff had been, his actions can be imputed to Defendants Lewis and Manginell under a civil-conspiracy theory, as discussed below.

for summary judgment, and there is a material issue of fact on that issue, the motion must be denied insofar as it concerns the breach-of-the-license-agreement claim.

**CIVIL CONSPIRACY:** In the civil context, a conspiracy alone is not sufficient to impose tort liability on the co-conspirators. *See Ettenson v. Burke, supra,* 17 P.3d at 445. Instead, a tort claim for civil liability must be based on an action or actions that would themselves give rise to a civil action. *Id.* In other words, one member of the conspiracy must commit an actionable tort; the civil conspiracy doctrine then allows liability for that tort to be imputed to the other members of the conspiracy, making them all jointly and severally liable for the torts of any of the co-conspirators. *Id.* In support of the civil conspiracy claim in this case, Plaintiff has recited a long litany of allegedly wrongful actions taken by the Individual Defendants. As discussed below, however, most of those actions are entirely separate from any actionable tort committed by any member of the alleged conspiracy, and therefore may not be the basis of a civil conspiracy claim.

Plaintiff begins by relating events that occurred before the license agreement between Sandia and Plaintiff was executed in December 2001. These events included Manginell's attempt to convince Frye-Mason to leave his position with Plaintiff, and the claimed attempts by Manginell and Lewis to limit the technology covered by the exclusive license provisions of the license agreement. Frye-Mason did not comply with Manginell's request, and no evidence has been submitted to indicate that the exclusive licenses obtained by Plaintiff were in fact limited as a result of the actions of Manginell and Lewis. Actions that do not cause any legal consequences cannot be said to be connected to an actionable tort.

Plaintiff next complains of several incidents that occurred shortly after the license agreement was executed. First, Lewis would not cooperate with Frye-Mason's attempt to file a patent application on one piece of technology covered by the Agreement to License. As the Court has already discussed, this act by Lewis did not rise to the level of an actionable tort. Similarly,

Manginell's act of advising Sandia not to enter into a "CRADA"[9] is not actionable, as no information has been provided concerning the CRADA; there is no evidence Plaintiff had asked to enter into a CRADA, had the funds to contribute to a CRADA, or even knew Sandia might be contemplating the possibility of a CRADA. Plaintiff also points out that the Individual Defendants attended a meeting with representatives of a potential investor which had previously been in negotiations with Plaintiff. Again, there is no evidence that anything came of that meeting, and therefore there is no evidence of an actionable tort upon which a conspiracy claim could be based.

Plaintiff also maintains the Individual Defendants, by failing to cooperate with Sandia's efforts to comply with the obligations of the gold brick letter, caused or contributed to the alleged four-year delay in turning over the entirety of the gold brick information. As the Court has already discussed above, there is no evidence tending to show that Lewis was ever asked to provide any information to Plaintiff, and the only evidence is that Manginell actually provided the three pieces of information he was asked to supply. Therefore, neither Lewis nor Manginell committed an actionable tort in connection with the gold brick letter. As to Adkins, although as discussed above there is an issue of fact as to whether he caused or contributed to a breach of the gold brick letter, his action cannot be imputed to Lewis or Manginell for purposes of creating a conspiracy. At the time Adkins acted in the summer of 2004, there had been no recent discussion of the formation of a private company, Defiant, to commercialize sensor technology.[10] As the only Individual Defendant involved in the action, Adkins cannot have been acting on behalf of the conspiracy alleged by Plaintiff.

Plaintiff's final contention is that the Individual Defendants conspired to commit tortious interference with contract by convincing Sandia to terminate Plaintiff's exclusive licenses and grant

---

[9]Again, for purposes of this opinion, it is not necessary to explain what a "CRADA" is.

[10]Plaintiff itself asserts the decision to do so occurred in the spring of 2005, after Adkins developed his "drop-in die manifold" technology in the fall of 2004. [Pltf. Resp. p. 53]

16

them, or some of them, to Defiant. This is the only conspiracy claim that has sufficient factual support to proceed to trial. As discussed above, although even this evidence is quite thin there is sufficient evidence to allow this aspect of the tortious-interference claim to proceed. Furthermore, although there is evidence showing that Adkins may have been the primary communicator between Sandia and Defiant, there is enough evidence of joint action between Adkins, Lewis, and Manginell to potentially impute Adkins' conduct to the others for purposes of a civil conspiracy claim.[11]

Based on the foregoing discussion, summary judgment will not be granted on one aspect of Plaintiff's civil conspiracy claim. As to the remainder of the claim, however, summary judgment is appropriate.[12]

**CONCLUSION:** Based on the foregoing, the motion for partial summary judgment filed by the Individual Defendants will be granted in part and denied in part.

**ORDER**

A Memorandum Opinion having been entered this date, it is hereby ORDERED that the motion for partial summary judgment filed by the Individual Defendants (Doc. 187) be, and hereby is, GRANTED in part and DENIED in part. This is not a final, appealable order, as it does not dispose of all claims and counterclaims present in this case.

---

[11]For example, it is undisputed that all three Individual Defendants started discussing the formation of a private company in March 2005, then incorporated Defiant in June. Given the circumstances, it can be inferred that all three cooperated in deciding what technology to ask for from Sandia, and in making other decisions as well.

[12]This includes one alleged wrongful act mentioned in Plaintiff's summary of the Individual Defendants' actions. Plaintiff complains that Adkins "withheld the key piece of technology that would enable a spin-off entity to commercialize the MicroChemLab technology[.]" [Pltf. Resp. p. 54] Plaintiff has provided no evidence that would indicate Adkins had a duty to give this technology, developed while he was employed at Sandia and almost three years after the license agreement was executed, to Plaintiff. Absent such evidence, Adkins' failure to hand over information concerning the "drop-in die manifold" process he had created was not actionable in tort.

Dated this 23rd day of October, 2007.

                                                                              _____
                                                                              BRUCE D. BLACK
                                                                              UNITED STATES DISTRICT JUDGE